GRIFFIS, P.J., for the Court:
¶ 1. James Luster appeals his murder conviction and life sentence. He argues that the verdict was against the overwhelming weight of the evidence, his trial counsel was ineffective, and the trial court committed plain error when it allowed jury instruction S-l. We find no error and affirm.
FACTS
¶2. On March 6, 2012, around 11:00 p.m., Carlos “Moe” Wright was shot multiple times while at home. Moe’s neighbor, David Ross, heard the gunshots and saw two men run across his backyard. Ross could not identify either man. He contacted the police.
¶ 3. Natchez Police Officer Elvis Prater was dispatched. While in route, Officer Prater spotted Cedrick Jones. Jones was loading a body into a vehicle. Jones waved at Officer Prater. Officer Prater stopped. Jones told Officer Prater that his friend, Moe, had just been shot and that he was about to take Moe to the hospital. Officer Prater noticed that Moe was unresponsive and had no pulse. Officer Prater called for an ambulance and back-up.
*639 ¶ 4. Investigator Otis Mozique was also dispatched to the scene. Investigator Mo-zique testified that when he arrived, Officer Prater was already there. Investigator Mozique saw Moe lying face-up on the passenger seat of Jones’s vehicle. Moe appeared to have been shot four or five times. The ambulance was there. Investigator Mozique asked Officer Prater to take Jones to the police station, because Investigator Mozique wanted to speak with him.
¶ 5. Investigator Mozique took photographs and processed the scene. Investigator Mozique also took photographs of Moe. Investigator Mozique then went to Moe’s house and took photographs of the bullet casings he found. One empty casing was on the porch and was a .40 caliber. Investigator Mozique noticed blood around the side of the house. Investigator Mo-zique found a .40 caliber casing and two spent projectiles on the ground and took photographs of them. Investigator Mo-zique then went to the police station to speak with Jones. Investigator Mozique could not testify to what Jones told him but did state that after he spoke with Jones, Investigator Mozique and several other police officers went to an address that belonged to Luster. At the address, the officers found Robin Tyler but did not find Luster. Tyler was questioned.
¶ 6. On March 7, Luster voluntarily turned himself in after he learned that the police were looking for him. Luster was accompanied by his girlfriend, Alexis Williams, Ethel Williams, and Ethel’s boyfriend, Kacy Campbell. Luster told Investigator Mozique that he had been in Vida-lia, Louisiana, with Alexis, at the time of the homicide.
¶ 7. Alexis testified that Ethel, Luster, Campbell, and she were all at Ethel’s home in Vidalia. Luster arrived there between 4:30 p.m. and 5:00 p.m. Luster asked to borrow Alexis’s Chevrolet Malibu between 10:30 p.m. and 11:00 p.m. Luster told Alexis that he was going to meet “Tiger, [Gerald Davis], and [Frederick Hunt].” Alexis testified that Luster returned to the house between midnight and 1:00 a.m. Alexis overheard Luster tell Campbell that “he had killed someone by the name of Moe.” Alexis testified that she heard Luster confess that he had gone to Moe’s house, had knocked on the door, and told Moe to “give up everything he had.” Moe started to wrestle with Luster, and Luster shot Moe. Davis and Hunt were present afterwards. Alexis also testified that the next day, Luster asked Ethel, Campbell, and her to take him to the police department. Before they arrived, Luster told them to tell the police that he had not left Vidalia the day before.
¶ 8. Initially, Alexis told Investigator Mozique that Luster never left the house the night of the murder. Investigator Mo-zique was not satisfied with the alibi that Alexis provided for Luster. Alexis and Ethel were questioned again between March 17 and March 20. Alexis changed her story and told Investigator Mozique that she had lied to him, because Luster told her to lie, and she was seared of Luster. Alexis gave information to Investigator Mozique that incriminated Luster. Luster was arrested and formally charged with Moe’s murder.
¶ 9. Ethel testified that Luster came to her house to visit his cousin, Campbell. Luster arrived before Ethel went to work at 5:00 p.m. Ethel returned to her house after she got off work at 9:30 p.m. When she got home, Ethel ate, got her son ready for bed, and went to sleep around midnight. Luster was at Ethel’s house when she returned from work. Ethel testified that Luster left her house around 10:30 p.m., and she did not see him again until the next day. Ethel also testified that she, *640 Alexis, and Campbell took Luster to the police station on March 7. Luster did not tell Ethel why he needed to go to the police station.
¶ 10. Hunt testified that he had not known Luster for very long. Hunt testified that on March 6, between 10:00 p.m. and 11:00 p.m., he, Davis, and a few others were shooting dice. Luster arrived in a Malibu. While there, Luster got a .40 caliber gun from Gerry Byrd. Hunt wanted some “weed,” so he and Davis got in the car with Luster and drove to Moe’s house. Luster got out of the Malibu, and Moe came outside. Luster and Moe started to talk. Hunt testified that he saw Luster pull out a gun and heard Moe tell him that his landlord lived next door. Moe tried to run, but Luster started to shoot. Hunt got out of the vehicle and ran up and down the street. Hunt testified that he got back in the vehicle because he was afraid. Luster told Davis that Moe was not dead and that Moe had seen their faces. Hunt jumped out of the vehicle and started to run. Hunt heard more shots and turned to see Davis running behind him. Davis threw a gun in the bayou. Hunt testified that he and Davis met up with Luster on Alabama Street. Luster drove Hunt and Davis back to where they played dice.
¶ 11. Davis testified that he had known Luster for five or six years. On March 6, Davis, Hunt, and others were shooting dice. Luster told them, “I’m fixing to hit a lick.” Davis and Hunt wanted some money, so they got in the Malibu with Luster. Hunt had a .38 caliber gun with him. Luster drove to Moe’s house. Luster and Moe got into an argument, and Luster shot Moe. Luster walked to the car and told Davis to get out. Luster told Davis to shoot Moe or else Luster would shoot Davis. Davis testified that he shot Moe twice in the buttocks. Davis did not know if Moe was alive or dead. Davis testified that he ran back to the vehicle and then ran up the street with Hunt. Davis and Hunt ran behind Ross’s house and through the bayou, where Davis threw his gun. Davis testified that after they ran through the bayou, Luster saw them, picked them up, and dropped them off at a store. Luster told Davis and Hunt “not to say nothing, and if we did we would be killed too.” Davis testified that Luster gave him the .40 caliber pistol Luster used, so Davis could return it to Byrd. Davis admitted that he was in the Bloods gang.
¶ 12. On July 23, 2012, Luster, Davis, and Hunt were all charged with Moe’s murder. Luster’s trial was held on January 29-30, 2013. Luster was found guilty of Moe’s murder and sentenced to life in the custody of the Mississippi Department of Corrections.
¶ 13. On February 4, 2013, Luster filed a motion for a new trial, or in the alternative, a judgment notwithstanding the verdict, which the trial court denied. Luster now appeals to this Court.
ANALYSIS

I. Whether the verdict was against the overwhelming weight of the evidence.

¶ 14. Luster argues that he should be granted a new trial because the weight of the evidence does not support a conviction of premeditated murder. Alternatively, Luster argues that if this Court does not grant him a new trial or an acquittal, the evidence only supports a manslaughter conviction.
¶ 15. Luster was charged with murder, under Mississippi Code Annotated section 97-3-19(l)(a) (Supp.2013), which is defined as “[t]he killing of a human being without authority of law by any means or in any manner ... [w]hen done with deliberate *641 design to effect the death of the person killed, or of any human being....”
¶ 16. The jury instructions asked the jury to decide whether Luster “willfully, unlawfully, feloniously, and with deliberate design” killed Moe by shooting him. Another instruction read:
The court instructs the jury that “deliberate design” ... means an intent to kill without authority of law, and not being legally justifiable, or legally excusable. “Deliberate” always indicates full awareness of what one is doing, and generally implies careful and unhurried consideration of the consequences. “Design” means to calculate, plan, or contemplate. “Deliberate design” to kill a person may be formed very quickly, and perhaps only moments before the act of killing the person. However, a “deliberate design” cannot be formed at the very moment of the fatal act.
¶ 17. The jury was also given a manslaughter instruction. Manslaughter is “[t]he killing of a human being, -without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense....” Miss.Code Ann. § 97-3-35 (Rev.2006).
¶ 18. When we review a denial of a motion for a new trial based on an objection to the weight of the evidence, this Court “will only disturb [the] verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Bush v. State, 895 So.2d 836, 844 (¶ 18) (Miss.2005). This Court must consider the evidence in the light most favorable to the verdict. Id. “This Court does not have the task of re-weighing the facts in each case to, in effect, go behind the jury to detect whether the testimony and evidence they chose to believe was or was not the most credible.” Langston v. State, 791 So.2d 273, 280 (¶14) (Miss.Ct.App.2001).
¶ 19. Here, the jury was given the option to decide whether the evidence supported a conviction of murder or manslaughter. Alexis and Ethel testified that Luster was not at Ethel’s house at the time Moe was killed. Alexis stated that before Luster left Ethel’s house, he told her that he was going to meet “Tiger, [Davis], and [Hunt].” Alexis testified that Luster told her to tell the police he did not leave Ethel’s house on the night of the murder. Luster’s codefendants both testified that they saw Luster shoot Moe.
¶ 20. When we consider the evidence presented in the light most favorable to the verdict, we cannot conclude that the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. Accordingly, we find no merit to this issue.

II. Whether Luster received ineffective assistance of counsel.

¶ 21. Next, Luster argues that his trial counsel was constitutionally ineffective under the Sixth and Fourteenth Amendments, because (1) counsel did not object to jury instruction S-l as nonconforming to the charge as set out in the indictment, and (2) counsel did not ask the trial court to instruct the jury that the codefendants’ testimony should be viewed with great caution and suspicion.
¶ 22. To prove ineffective assistance of counsel, Luster must prove that (1) his counsel’s performance was deficient, and (2) this deficiency prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The burden of proof rests with Luster to show both prongs. McQuarter v. State, 574 So.2d 685, 687 (Miss.1990). *642 Under Strickland, there is a strong presumption that counsel’s performance falls within the range of reasonable professional assistance. Strickland, 466 U.S. at 689, 104 S.Ct. 2052. To overcome this presumption, Luster “must show that there is a reasonable probability that, but for the counsel’s unprofessional errors, the result of the proceeding would have been different.” Id. at 694,104 S.Ct. 2052.
¶ 23. The merits of a claim of ineffective assistance of counsel brought on direct appeal should be addressed only when “(1) the record affirmatively show[s] ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge.” Colenburg v. State, 735 So.2d 1099, 1101 (¶ 5) (Miss.Ct.App.1999). The supreme court has held:
The question presented ... is not whether trial counsel was or was not ineffective but whether the trial judge, as a matter of law, had a duty to declare a mistrial or to order a new trial[ ] sua sponte on the basis of trial counsel’s performance. “Inadequacy of counsel” refers to representation that is so lacking in competence that the trial judge has the duty to correct it so as to prevent a mockery of justice. Parham v. State, 229 So.2d 582, 583 (Miss.1969).
Id. at 1102 (¶8). If this Court does not reverse on other grounds and is unable to conclude that the defendant received ineffective assistance of counsel, it should affirm “without prejudice to the defendant’s right to raise the ineffective assistance of counsel issue via appropriate post-conviction proceedings.” Id. at 1101 (¶ 5). Review of an ineffective-assistance-of-counsel claim on direct appeal is “confined strictly to the record.” Id. at 1102 (¶ 6).
¶24. Here, we have thoroughly reviewed the record, and we do not find that the record affirmatively shows ineffectiveness of constitutional dimensions. Further, the parties have not stipulated that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge. Therefore, we affirm as to the issue of ineffective assistance of counsel without prejudice to Luster’s right to raise the ineffective-assistance-of-counsel issue in post-conviction proceedings.

III. Whether the trial court committed plain error when it gave jury instruction S-l.

¶ 25. Luster argues that the trial court committed plain error when it granted jury instruction S-l. Luster contends that this allowed the jury to convict Luster on an element of the offense not charged in the indictment.
¶ 26. The plain-error doctrine requires an appellant to show that there was an error in the trial court that resulted in a “manifest miscarriage of justice.” Blunt v. State, 55 So.3d 207, 211 (¶ 16) (Miss.Ct.App.2011). The plain-error doctrine only applies when the error complained of affects a defendant’s fundamental right. Id. Luster asserts that his fundamental right of due process of law under the Sixth and Fourteenth Amendments of the U.S. Constitution was infringed upon.
¶ 27. The indictment and instruction S-1 both defined murder as provided in section 97 — 3—19(l)(a). The indictment read “that James Luster, Frederick Hunt, and Gerald Davis[,] ... on or about March 6, 2012, acting in concert, one with the other, did knowingly, intentionally ... and of their malice aforethought, kill and murder one Carlos Wright.” Instruction S-l provided that if the jury found from the evi *643 dence beyond a reasonable double that “James Luster, either by himself or acting in concert with another or others,” murdered Moe, Luster must be found guilty of murder.
¶ 28. The addition of the language “either by himself’ did not change the elements that must be proven for the jury to find Luster guilty of murder. Therefore, we find no merit to this issue.
¶ 29. THE JUDGMENT OF THE ADAMS COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO ADAMS COUNTY.
LEE, C.J., IRVING, P.J., BARNES, ISHEE, ROBERTS, CARLTON, MAXWELL, FAIR AND JAMES, JJ., CONCUR.